UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NICOLE URQUHART-BRADLEY,** | ) |
| **Plaintiff,** | ) ) ) No._____ |
| **v.** | ) ) |
| **CUSHMAN & WAKEFIELD, INC.** | ) **JURY TRIAL DEMANDED** ) ) |
| **Defendant.** | ) ) |

**COMPLAINT FOR DAMAGES**

Plaintiff Monica Nicole Urquhart-Bradley ("Plaintiff," "Plaintiff Urquhart-Bradley," or "Ms. Urquhart-Bradley"), by and through her attorneys Sanford Heisler Sharp, LLP, brings this action against Defendant Cushman and Wakefield, LLC ("Defendant," "Cushman & Wakefield," "C&W," or "the Company"). Plaintiff alleges as follows with knowledge as to her own actions and upon information and belief as to all other matters:

### I. OVERVIEW

1. On August 2, 2018, commercial real estate giant Cushman & Wakefield celebrated its debut as a publicly-traded company by inviting fourteen conspicuously diverse employees to represent it as "bell podium ambassadors" on the floor of the New York Stock Exchange ("NYSE").

2. A "highlight reel" of the IPO circulated to C&W employees on August 13, 2018 interspersed comments by the ambassadors with clips of the morning's event. The video culminates with the ringing of the bell by one white male ambassador while another stands next to

him pumping his fist in the air; the rest of the ambassadors—mostly women in the foreground—stand to either side, smiling and applauding.

3. As the only African American female executive leading a service line at Cushman & Wakefield (and one of only two female service line leaders at the Company), Plaintiff Urquhart-Bradley became accustomed to playing the role of ambassador for "diversity" at C&W, which regularly deployed her to project a public image that was at odds with a deeply entrenched culture of discrimination against women and people of color.

4. In fact, Ms. Urquhart-Bradley's own rise to national leadership at C&W had almost been derailed in 2010 when John Busi, then-President of Global Valuation and Advisory ("V&A") for C&W, sought to promote her to Head of V&A for the United States.

5. Specifically, then-CEO of the Americas for C&W, Jim Underhill, told Mr. Busi that he didn't believe that Ms. Urquhart-Bradley was right for the role. When pressed, however, Mr. Underhill was unable to articulate any specific concerns about Plaintiff's performance.

6. Both Mr. Busi and Plaintiff assumed that C&W's reluctance to promote Plaintiff was due at least in part to her gender (female) and race (African American). Nevertheless, Mr. Busi – a white male who strongly supported Plaintiff's candidacy – prevailed, and Ms. Urquhart-Bradley received the promotion to Head of V&A for the United States in 2010.

7. Thanks to her superior performance in that role over the six years that followed, Ms. Urquhart-Bradley was the obvious choice to succeed Mr. Busi as President of Global V&A when, in August 2016, he left C&W to start a V&A division for its competitor, Newmark Knight Frank.

8. While Cushman & Wakefield was happy to offer Plaintiff her white male predecessor's job responsibilities, it refused to give her Busi's global title to accompany them; instead, C&W offered Ms. Urquhart-Bradley the lesser title of President of V&A Americas.

9. Even after subjecting Plaintiff to this glaringly unequal treatment, when C&W attempted to establish a Diversity & Inclusion Council ("Diversity Council") the following year, the Company predictably turned to Ms. Urquhart-Bradley once again, seeking her participation as a member of the group's Executive Committee.

10. The first meeting of the Diversity Council took place on June 22, 2017 and focused on the lack of diversity at C&W, particularly in revenue-generating leadership roles. At the time, Ms. Urquhart-Bradley was still one of only two female service line leaders; she and her sole female counterpart regularly commiserated about their exclusion from Executive Leadership communications.

11. At that meeting, participants learned that the statistics on racial diversity at C&W were even worse than those on gender. One attendee noted that CEO Lickerman had just gone through a succession plan and had only identified white men. After another meeting in August 2017, however, all calls and communications about the Diversity Council ceased.

12. Plaintiff spent much of 2017 working tirelessly to anticipate and defend against her white male predecessor's campaign to poach Cushman & Wakefield's V&A team, an effort referred to internally at C&W as "the Newmark Siege."

13. When Mr. Busi resigned from C&W in 2016, the Company had responded by offering him $3 million to stay, which Mr. Busi rejected. A year later, C&W paid millions of dollars to retain its V&A executives and employees whom Mr. Busi now sought to hire. These payments included almost $2 million to retain two of Plaintiff's white male subordinates.

14. Thanks to Plaintiff's efforts, C&W V&A beat back the Newmark Siege, retaining the entire leadership team.

15. Just a few months later, however, Cushman & Wakefield abruptly terminated Plaintiff, in a manner that left no doubt as to the Company's lack of a genuine commitment to diversity.

16. In late 2017, with the Newmark Siege behind her, Plaintiff reached out to C&W CEO Shawn Mobley to request a small fraction of the non-monetary retention benefits her white male subordinates had received.

17. In response, CEO Mobley accused Ms. Urquhart-Bradley of disloyalty and abruptly terminated her employment.

18. Just a few months later, C&W announced that Plaintiff would be replaced by her far less-qualified white male subordinate, one of those who had recently received a six-figure retention bonus after having actively pursued a competitor's offer.

19. Plaintiff Urquhart-Bradley brings this action against Cushman & Wakefield, her former employer, for discrimination based on race and gender, in violation of, *inter alia*, Section 1981 of the Civil Rights Act of 1866 ("§ 1981") and the District of Columbia Human Rights Act ("DCHRA").

## II. PARTIES
### A. PLAINTIFF

20. Plaintiff Monica Nicole Urquhart-Bradley ("Plaintiff," "Plaintiff Urquhart-Bradley," or "Ms. Urquhart-Bradley") is a 51-year-old, African American female resident of Columbia, Maryland.

21. In 2003, Ms. Urquhart-Bradley was hired as Manager of the Valuation and Advisory ("V&A") practice group in Cushman & Wakefield's Washington, D.C. office. At the

4

time of her termination in January 2018, she held the title of President of V&A Americas for C&W, performing in that role the same job for which her white male predecessor had held the higher title of President of Global V&A until his departure from the Company in August 2016.

22. At the time of her termination, Ms. Urquhart-Bradley's direct supervisor was John Santora, President of the Tri-State Region for C&W.

### B. DEFENDANT

23. Defendant Cushman and Wakefield, LLC is a multibillion-dollar real estate company headquartered in Chicago, Illinois, with locations throughout the United States. C&W opened its Washington, D.C. office in 1979.

### III. JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

25. This Court has personal jurisdiction over Defendant because one of the Company's offices is located in Washington, D.C. and because a substantial portion of the acts complained of, and giving rise to the claims alleged herein, occurred in this District.

26. Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiff was employed by Cushman & Wakefield in this District and because the events and omissions giving rise to the claims alleged herein occurred in this District.

27. Additionally, jurisdiction and venue are proper in this District because the parties contractually consented to this jurisdiction and venue for all disputes arising from the Employment Agreement at issue in this lawsuit.

## IV. PROCEDURAL HISTORY

28. In June 2018, Plaintiff filed a Charge of Discrimination with the EEOC and cross-filed the Charge with the D.C. Office of Human Rights ("EEOC Charge"), alleging, among other things, that the Company discriminated against Plaintiff on the basis of her race and gender. Thereafter, Plaintiff received a file-stamped copy of the EEOC Charge, identifying her Charge Number as 570-2018-02467.

29. The resolution of the EEOC Charge is currently pending. Plaintiff intends to amend her Complaint to add Title VII claims of race and gender discrimination upon receipt of a Notice of Right to Sue from the EEOC.

## V. FACTUAL ALLEGATIONS

### A. Employment History

30. Plaintiff Urquhart-Bradley began her commercial real estate career in 1988. In 2003, Plaintiff joined Cushman & Wakefield's Washington, D.C. office as Manager of its Valuation & Advisory ("V&A") practice group, bringing with her fifteen years of specialized experience. Within a year, the Company promoted her to V&A Manager of the Mid-Atlantic Region; in 2009, the Company expanded her management responsibilities to include the entire Northeast region.

31. In 2010, Plaintiff's supervisor John Busi, then the Global Head of V&A for C&W, promoted her to Head of V&A for the United States, despite resistance by then-CEO Jim Underhill. At the time, both Mr. Busi and Plaintiff attributed CEO Underhill's initial opposition to Ms. Urquhart-Bradley's candidacy—which Mr. Underhill was unable to justify with any reference to concerns about her performance—to race and/or gender-related bias. Ultimately, Mr. Busi prevailed and Ms. Urquhart-Bradley was promoted.

32. Ms. Urquhart-Bradley excelled in her new role. Under her stewardship, V&A revenue for the U.S. increased by 59% between 2010 and 2016. In 2017, the year Plaintiff took over Mr. Busi's role (albeit with a lesser title than her white male predecessor), V&A revenue in the Americas increased by 4% from the previous year, while earnings before interest, tax, depreciation and amortization ("EBITDA") increased 14%. In total, under Plaintiff's leadership, V&A Americas achieved gross revenue of $174.9 million in 2017.

33. During Plaintiff Urquhart-Bradley's years leading V&A at C&W, she successfully expanded the division's service offerings to include Diligence & Advisory, Financial Reporting, and Machinery & Equipment; successfully developed a technology platform that is currently unrivaled in the commercial real estate valuation industry; pitched and won the business of the Harvard University Endowment Portfolio, the largest in North America; and negotiated an exclusive partnership with a tech firm that has the potential to revolutionize the commercial real estate valuation industry.

34. For these and many other achievements, Ms. Urquhart-Bradley was honored in December 2017 as one of *BisNow*'s "Women of Influence in Commercial Real Estate."

**B.    Being a White Man Pays at Cushman & Wakefield**

35. In or around August 2016, Mr. Busi informed C&W that he was resigning to take a position with a direct competitor, Newmark Knight Frank. In response, C&W offered Mr. Busi $3,000,000 to remain at C&W. When Mr. Busi declined and left the Company, C&W thanked him for his years of service in the press release that announced Plaintiff's subsequent promotion.

36. While Ms. Urquhart-Bradley stepped into Mr. Busi's job upon his departure, the same was not true for his title—while Mr. Busi had held a global title, Plaintiff was offered the lesser title of President of V&A Americas.

7

37. This decision by C&W is consistent with a pattern and practice of refusing to offer female executives global titles. Other high-level women at C&W who have complained of this discriminatory practice include former Head of North Americas Research Maria Sicola, who for years sought a global title but did not receive one. In 2015, Ms. Sicola was replaced by white male Kevin Thorpe, who received a global title.

38. When an article in an industry publication remarked on the disparity between Ms. Urquhart-Bradley's title and that of her predecessor, Plaintiff brought this to the attention of the C&W's Human Resources and Marketing departments, highlighting the inconsistency between C&W's practices and its much-promoted efforts toward diversity and inclusion. Her concerns were dismissed.

39. When Plaintiff was first promoted to Americas President, she reported along with all service line heads to Joe Stettinius, then-CEO of the Americas. When, a few months later, Mr. Stettinius was replaced by Tod Lickerman as CEO of the Americas, Plaintiff was assigned to report to John Santora, President of the Tri-State Region. All other service line heads, none of whom were African American women, continued to report to the CEO of the Americas, a role now filled by Mr. Lickerman.

40. Beginning in June 2017, Plaintiff began getting calls from recruiters and firms about opportunities. She informed Mr. Santora about the calls and received express permission from him to meet with two of the firms—neither of which had V&A divisions at the time—to determine whether they were planning to launch competitive practices.

41. When John Busi's non-solicitation expired in August 2017, he began a concerted effort to convince approximately 100 key V&A professionals to leave C&W and join him at its competitor Newmark Knight Frank, an effort that became known internally at C&W as the

"Newmark Siege." Plaintiff had anticipated this and had worked tirelessly over the preceding year to ensure that the Company would retain its top performers. Within the first few months, Newmark had made verbal or written offers to ninety V&A professionals at C&W.

42. Nevertheless, with the assistance of Plaintiff's leadership team, all of whom Ms. Urquhart-Bradley had successfully kept at C&W despite the "Newmark Siege," Cushman & Wakefield managed to retain more than two thirds of the professionals Mr. Busi had sought to hire.

43. Among the approximately $14 million in retention bonuses C&W leadership approved were six- and seven- figure bonuses for two of the white men on Plaintiff's leadership team, Rick Latella ($1.1 million) and Eric Lewis ($875,000). Just a few months after abruptly terminating Ms. Urquhart-Bradley, C&W would appoint the far-less-qualified Mr. Lewis to replace her as President of V&A Americas.

44. Despite C&W's loss of 36 staff members responsible for annualized revenue of more than $16 million, V&A under Plaintiff's leadership exceeded both plan and the prior year's revenue in 2017.

**C. Disrespect and Hostility From White Male Supervisors Culminate in Plaintiff's Abrupt and Unwarranted Termination by Cushman & Wakefield**

45. In November 2017, Shawn Mobley, then President of the East Region at C&W, was promoted to CEO of the Americas.

46. As a regional president, Mr. Mobley's few interactions with Ms. Urquhart-Bradley were notable only for the disrespectful attitude he displayed toward Plaintiff. For example, during a Monthly Business Review in June 2017, then-President Mobley repeatedly interrupted the V&A MTD and YTD financial presentation, essentially forcing Plaintiff to reschedule it. During the presentation, the tone of CEO Mobley's questions and remarks was hostile and inappropriate for the setting.

47.     Plaintiff had a similar history with C&W's newly-appointed Chief Operating Officer Todd Schwartz ("COO Schwartz"). During one particularly hostile call, initiated by COO Schwartz in September 2017, he accused Ms. Urquhart-Bradley of being "defensive" and claimed that she had argued her point in an "unprofessional" manner. He then proceeded to provide Plaintiff with "mentoring," telling her that if she wanted to be "taken seriously" she needed to "stop whining" and "get with the program."

48.     After a meeting in New York in December 2017 that had included John Santora (in person) and C&W consultant Charlie Fraas (by phone), COO Schwartz waited until he was alone with Plaintiff Urquhart-Bradley to make a derogatory comment about African American Chief Information Officer Adam Stanley: "I hope he stops using that black/gay thing!"

49.     In early December 2017, Plaintiff scheduled a meeting with CEO Mobley to discuss her future with the Company. In response to a direct question, she said that she had received an offer from one of the firms Mr. Santora had permitted her to speak with, but affirmed that she wanted to stay at C&W.

50.     Moreover, in recognition of a recent cost-savings initiative at C&W, Ms. Urquhart-Bradley explained that she would not seek a monetary retention bonus, but instead wanted to build certain protections into her contract in the event of further changes in reporting or organization.

51.     On Friday, December 14, 2017, Plaintiff sent a follow-up email to CEO Mobley, expressing her excitement about being part of his expanded Executive Leadership team and what he had called "a new way forward." She included the contract language they had previously discussed and suggested that the language in her contract be enhanced since those with comparable language on her leadership team, namely Rick Latella and Eric Lewis, had also received (high) six- and seven-figure monetary retention bonuses, which she was not seeking.

52. Plaintiff received no response. On the eve of her planned flight to Chicago for Executive Leadership meetings, she followed up again. CEO Mobley promised to speak with Mr. Santora and COO Schwartz on Monday and said he would get back to her thereafter.

53. On the afternoon of Monday, December 17, 2018, having flown to Chicago as planned, Plaintiff received a text message from COO Schwartz asking if she would be going to dinner with the Executive Leadership team that night, which she confirmed. Shortly thereafter, CEO Mobley called, saying that he only had a few minutes to speak before a doctor's appointment. His tone quickly became hostile, as he demanded that Plaintiff "decide" whether she would be going to another firm; in response, she reiterated that she was committed to staying at C&W. Angrily, CEO Mobley disinvited Ms. Urquhart-Bradley from the Executive Leadership dinner and told her he would call her to continue the conversation that evening.

54. Instead, that night, CEO Mobley emailed Plaintiff at 7:00 p.m. wishing her safe travels home (in other words, telling Plaintiff that she would not be attending the meeting of the Executive Leadership team), and saying that the two would speak on Tuesday or Wednesday.

55. Late afternoon that Wednesday, CEO Mobley called to tell Plaintiff that he and unnamed "others" had "lost confidence" in her. When Ms. Urquhart-Bradley asked him to clarify, he told her to look for a job. In shock, she told him that she would not leave the Company voluntarily.

56. CEO Mobley shifted topics, complaining that Plaintiff's base salary exceeded what his had been before he became CEO; in response, Plaintiff noted that her salary had been based on external benchmarking requested by her predecessor and reminded CEO Mobley that she was not seeking any additional compensation.

11

57. After abruptly concluding the call, CEO Mobley ignored Plaintiff's efforts to reach him that weekend and the following week. Ms. Urquhart-Bradley spent Christmas and New Year's wondering whether she still had her job.

58. Plaintiff was not able to speak with CEO Mobley until January 5, 2018, when he demanded to know whether she had found a job yet. When Ms. Urquhart-Bradley again noted that she would not resign, CEO Mobley said he would be terminating her employment.

**D. C&W Paid White Men Who Threatened to Leave, Fired Plaintiff When She Expressed Her Desire to Stay, and Lied About Plaintiff's Departure**

59. Plaintiff subsequently learned from John Santora and others that CEO Mobley claimed, falsely, that C&W terminated her because she had been negotiating a contract with a competitor. Multiple C&W insiders over subsequent months have told Ms. Urquhart-Bradley that both CEO Mobley and COO Schwartz continue to offer this false representation as a justification for C&W's decision to terminate her employment.

60. In fact, Plaintiff never negotiated a contract with any company, let alone a direct competitor. Moreover, even if she had done so, C&W's response when her white male predecessor John Busi announced that he had *signed a contract* and *accepted a position* with an *actual competitor* was to offer him a $3 million retention bonus. Other white male V&A employees to whom C&W granted six- and seven-figure retention bonuses after they had actively pursued offers from competitors in the V&A space include Eric Lewis, Rick Latella, John Feeney, and Jimmy Berry, among others. For simply considering an offer from a non-competitor, by contrast, Ms. Urquhart-Bradley was summarily terminated by C&W.

61. Consistent with her swift rise at C&W, Plaintiff achieved above average performance ratings throughout her time at the Company. Under her leadership, V&A was one of just a few service lines at C&W that exceeded its plan in 2017. As of mid-2017, the Company's

V&A team was comprised of more than 600 professionals in the Americas and appraised more than $1 trillion in property per year.

62. During a V&A Leadership call on January 13, 2018, John Santora himself acknowledged that Plaintiff's performance was not the cause of her departure from C&W; however, he falsely claimed that C&W and Ms. Urquhart-Bradley had "mutually" decided to part ways. Numerous members of Plaintiff's leadership team immediately stated that this could not be true and demanded to know how this could have happened when V&A had outperformed its expectations in 2017 despite the "Newmark Siege" and resulting attrition.

63. When Plaintiff's departure from C&W became public, despite the fact that it was (falsely) presented by the Company as a mutual decision, many former colleagues were quick to observe that they believed C&W would never have terminated Ms. Urquhart-Bradley, given her excellent performance and stellar reputation, if she were not an African American woman.

64. Despite having wrongfully terminated Plaintiff's employment, C&W immediately sought to enforce a twelve-month non-compete agreement against Ms. Urquhart-Bradley. As a result, Plaintiff's earning power going forward may be limited, since she will have been out of the industry for at least one year by the time she is able to take another position.

65. Plaintiff's former colleagues who have stated that they believe Ms. Urquhart-Bradley's race and gender led to her termination by C&W include former President of Global V&A Busi, former V&A leadership team member David Gray, and former head of Human Resources for the Americas Charlene Pickus. In fact, when Plaintiff and Ms. Pickus met shortly after Plaintiff's January 2018 termination, Ms. Pickus expressly encouraged Plaintiff to sue the Company for discrimination.

66. In April 2018, Cushman & Wakefield elevated Ms. Urquhart-Bradley's former subordinate Eric Lewis, a significantly less qualified white male, to replace her as President of V&A Americas.

67. When Ms. Urquhart-Bradley took on the role of President of V&A Americas at C&W, she had extensive experience managing human resources issues, preparing budgets, monitoring and managing expenses, and overseeing financial reporting – all critical qualifications for the position.

68. By contrast, when C&W appointed Mr. Lewis to the same position, he had nominal to no experience managing human resources and barely any experience with the financial aspects of running a real estate service line. Moreover, the Hospitality & Gaming group led by Mr. Lewis had brought in only $10.23M in gross revenue in 2017, less than one tenth of what Ms. Urquhart-Bradley had achieved in 2017 for V&A as a whole.

69. The press release touting Mr. Lewis's credentials further highlights his inferior qualifications for the position to which C&W has now elevated him. For example, C&W's release cites Mr. Lewis's recent experience managing "25 valuation professionals," apparently viewing this as ample qualification for Mr. Lewis's new role overseeing "600 professionals across six core services, 17 practice groups, and 70 offices" as President of V&A Americas. By contrast, at the time of her appointment to V&A Americas President, Ms. Bradley had six years of experience overseeing C&W's entire V&A operation in the United States.

## VI.   COUNTS

### COUNT I
### VIOLATION OF 42 U.S.C. § 1981
### RACE DISCRIMINATION

70.    Plaintiff Urquhart-Bradley re-alleges and reincorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

71.    Defendant C&W discriminated against Plaintiff, in violation § 1981, by subjecting her to differential treatment on the basis of her race.

72.    Defendant discriminated against Plaintiff by subjecting her to unequal terms and conditions of employment and a hostile work environment based on her race, culminating in her unlawful termination.

73.    Defendant's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of Plaintiff's rights.

74.    As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost future employment opportunities, lost earnings, lost benefits, and other financial loss, as well as reputational injury, humiliation, embarrassment, emotional and physical distress, and mental anguish.

75.    By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of § 1981, including an award of punitive damages.

76.    Attorneys' fees should be awarded under 42 U.S.C. § 1988(b).

**COUNT II**
**VIOLATION OF THE DCHRA**
**D.C. Code § 2-1401 *et seq*. AS AMENDED**
**RACE DISCRIMINATION**

77. Plaintiff re-alleges and reincorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

78. Defendant C&W is an employer within the meaning of the DCHRA.

79. Defendant C&W discriminated against Plaintiff, in violation of the DCHRA, by subjecting her to differential treatment on the basis of her race.

80. Defendant C&W discriminated against Plaintiff by subjecting her to unequal terms and conditions of employment and a hostile work environment based on her race, culminating in her unlawful termination.

81. C&W's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of Plaintiff's rights.

82. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost future employment opportunities, lost earnings, lost benefits, and other financial loss, as well as reputational injury, humiliation, embarrassment, emotional and physical distress, and mental anguish.

83. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

84. Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**COUNT III**
**VIOLATION OF THE DCHRA**
**D.C. Code § 2-1401 *et seq*. AS AMENDED**
**GENDER DISCRIMINATION**

85. Plaintiff re-alleges and reincorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

86. Defendant C&W is an employer within the meaning of the DCHRA.

87. Defendant C&W discriminated against Plaintiff, in violation of the DCHRA, by subjecting her to differential treatment on the basis of her gender.

88. Defendant discriminated against Plaintiff by subjecting her to unequal terms and conditions of employment and a hostile work environment based on her gender, culminating in her unlawful termination.

89. C&W's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of Plaintiff's rights.

90. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost future employment opportunities, lost earnings, lost benefits, and other financial loss, as well as reputational injury, humiliation, embarrassment, emotional and physical distress, and mental anguish.

91. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

92. Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(1) Award Plaintiff back pay, front pay, lost benefits, and other damages for lost compensation and job benefits suffered by Plaintiff in an amount not less than $10,000,000;

(2) Award Plaintiff nominal, liquidated, and compensatory damages in an amount to be determined by a jury;

(3) Award Plaintiff punitive damages against Defendant in an amount not less than $20,000,000;

(4) Award Plaintiff pre-judgment and post-judgment interest;

(5) Award penalties available under applicable laws;

(6) Order Defendant to make Plaintiff whole by providing her with monetary and other affirmative relief;

(7) Award Plaintiff litigation costs and expenses, including, but not limited to, attorneys' fees and costs related to her prosecution of this action; and,

(8) Award additional and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right by jury.

Respectfully submitted,

Date: September 25, 2018          /s/ David W. Sanford

David W. Sanford (D.C. Bar No. 457933)
Melinda Koster*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
mkoster@sanfordheisler.com

Deborah K. Marcuse** (D.C. Bar No. 99538)
SANFORD HEISLER SHARP, LLP
400 East Pratt Street, 8th Floor
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7420
dmarcuse@sanfordheisler.com

*Attorneys for Plaintiff Urquhart-Bradley*

* *Pro hac vice* application forthcoming

** Application for admission forthcoming