UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLE URQUHART-BRADLEY,

    *Plaintiff,*

v.

CUSHMAN & WAKEFIELD, INC. et al.,

    *Defendants.*

Case No. 1:18-cv-02213-RCL
**SEALED**

## MEMORANDUM OPINION

In 2018, Nicole Urquhart-Bradley filed this suit against her former employer, Cushman & Wakefield, Inc. ("C&W") and her former supervisor, Shawn Mobley ("Mobley"), alleging that she was discriminated against based on her race and gender. She initially alleged various counts of race and gender discrimination under 42 U.S.C. § 1981 and the District of Columbia Human Rights Act ("DCHRA"), and later amended her complaint to include additional claims under the DCHRA and Title VII of the Civil Rights Act of 1964. ECF Nos. 1, 17. Defendants have moved for summary judgment on all claims. ECF No. 104. Upon consideration of that motion, the opposition, ECF No. 112, and the reply, ECF No. 116, the Court will **DENY** the motion as to as to Count I–X and **GRANT** the motion as to Counts XI–XIII.

## I. BACKGROUND

### A. Factual Background

Most of the facts in this section come from Urquhart-Bradley's response to defendants' statement of material facts, ECF No. 112-2, which incorporates defendants' factual contentions,

1

Urquhart-Bradley's responses, and Urquhart-Bradley's statement of additional facts.[1] The Court will note areas of dispute. In 2003, Urquhart-Bradley began working for C&W, a commercial real estate company. ECF No. 112-2 ¶ 1. While she began as a manager of the Valuation and Advisory ("V&A") practice group, she quickly rose through the ranks: from manager of the region, to manager of multiple regions, to head of V&A for the United States. *Id.* ¶ 1–4. Urquhart-Bradley reported to John Busi until his departure in 2016. *Id.* ¶ 7. At the time of his departure from the company, Busi was the global President of V&A. ECF No. *Id.* ¶ 134.

John Busi left C&W for a competitor, Newmark, in August 2016. *Id.* ¶ 12. When Busi informed C&W that he had an offer to go to another company, C&W responded with an expansive retention package. ECF No. 113-6 ¶ 157. Busi, after discussing with his attorney, ultimately rejected C&W's counteroffer and left for Newmark. *Id.* ¶ 159. Tod Lickerman, a member of C&W's leadership team, immediately expressed regret that Busi had not "let [them] counter[offer]" again. ECF No. 113-13 at 5.

Following Busi's departure, C&W promoted Urquhart-Bradley to his position and granted her the title of President of V&A for the Americas. ECF No. 112-2 ¶ 12. She initially reported to the Americas Chief Executive Officer ("CEO") Joe Stettinius, as Busi had. *Id.* ¶ 139. When

---

[1] Defendants did not respond to plaintiff's statement of additional material facts. Instead, they argued in their reply that Urquhart-Bradley's facts must be "ignored and/or stricken." ECF No. 116 at 2. Defendants helpfully cited this Court's decision in *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304, 315 (D.D.C 2010) when arguing that plaintiff's facts should be stricken, so the Court will repeat its ultimate conclusion here: "In interpreting [local rule 7(h)(1)], the Circuit Court has prescribed caution, warning of the drastic consequences of striking a party's statement of fact. The remedy should be reserved for those cases involving 'egregious conduct.' . . . While the plaintiff's statement is inappropriately long and evasive, the Court cannot say that a statement of fact which otherwise comports with local rule 7(h) by citing to the record, separately responding to each of defendant's statements, and refraining from legal argument is egregious and ought to be stricken." *Id.* at 315–16 (citations omitted). Given the frankly frivolous nature of this argument, the Court also declines to grant the request for alternative relief hidden in a footnote, ECF No. 116 at 4 n.2. The Court will not grant extra time for defendants to reply to Urquhart-Bradley's statement of additional facts—they were more than welcome to either do so in their Reply or file a separate Motion to Strike, and they declined.

Lickerman succeeded Stettinius as Americas CEO a few months later, she began reporting to John Santora ("VC Santora"), C&W's Vice Chairman and President of the New York Tri-State Region. *Id*. ¶¶ 8,140.

A year into Urquhart-Bradley's tenure as President of V&A for the Americas, the nonsolicitation clause in her predecessor Busi's contract expired, and he began recruiting his former C&W colleagues in earnest. *Id*. ¶ 12. During this period, which the parties have referred to as the "Newmark Siege," Urquhart-Bradley spearheaded the fight to "retain the V&A staff that Busi was attempting to recruit to Newmark." *Id*. ¶ 13. Urquhart-Bradley, then-Americas CEO Lickerman, Americas Chief Operating Officer ("COO") Schwartz, and VC Santora worked together to fend off Busi's recruitment tactics, paying over $14 million in retention payments to members of the V&A team. *Id*. ¶ 13–14. Urquhart-Bradley requested, and Lickerman approved, the largest retention payments to Eric Lewis, her eventual successor, and V&A retail group leader Rick Latella. *Id*. ¶ 15. Latella and Lewis each ultimately received over $1 million in retention benefits. *Id*. ¶ 16–17. While the Newmark Siege continued into December 2017, by then Busi's recruitment attempts were not as aggressive as they had been before, and the worst of the "siege" was over. *Id*. ¶ 19.

The opinion among C&W leadership was that Urquhart-Bradley's performance during the Newmark Siege was superior. *Id*. ¶ 143–148. VC Santora rated Urquhart-Bradley's performance running V&A as an "8 out of 10." *Id*. ¶ 145. Her work during that period was praised as "excellent" and "outstanding" by both Lickerman and Brian Corcoran, another high-ranking executive at C&W. *Id*. ¶ 146. COO Schwartz admitted she "did a good job." *Id*. ¶ 147.

As the Newmark Siege began to slow down in late November 2017, defendant Shawn Mobley became the Americas CEO, replacing Lickerman. *Id*. ¶ 20. Though Mobley and Urquhart-

Bradley had interacted infrequently in the past, Urquhart-Bradley characterizes at least two of these interactions as negative. On two separate occasions, during company leadership meetings in 2017, Mobley interrupted presentations Urquhart-Bradley was making. *Id.* ¶ 22. In the first instance, during a June monthly meeting where she was slated to give a fifteen-minute presentation, Mobley interrupted and "over-talk[ed]" Urquhart-Bradley to the point that her presentation had to be rescheduled. ECF Nos. 107-1 at 24 & 113-8 at 14. Two months later, in an August monthly meeting, he again interrupted her with a "very harsh, hostile, angry" tone. ECF No. 113-8 at 15. This time, Urquhart-Bradley called him afterwards to tell him she was "disappointed in the way the call went." *Id.* at 15–16. Urquhart-Bradley also testified in a deposition that she had attended calls where she observed Mobley interrupt a female C&W employee in the same way. ECF No. 107-1 at 26. Defendants dispute these facts, arguing that Mobley has an issue with interrupting others of all genders, "not just women." ECF No. 112-2 ¶ 23.

On December 6, 2017, Urquhart-Bradley told COO Schwartz that other firms were "courting" her. *Id.* ¶ 26. The issue of whether Urquhart-Bradley truly secured a job offer is disputed. Defendants repeatedly characterize this as a lie, *e.g., id.* ¶ 55, while Urquhart-Bradley testifies that, regardless of the offer's formality, she had been repeatedly approached by recruiters, *id.*, and was in "conversations" with a company, ECF No. 107-1 at 52. COO Schwartz, upon learning this information, informed VC Santora, Urquhart-Bradley's supervisor, and Mobley. ECF No. 112-2 ¶ 27. In an email to Mobley, he called the situation a "retention issue." *Id.* Mobley agreed to meet with Urquhart-Bradley on December 13, 2017. *Id.* ¶ 29. Prior to the meeting, Mobley reviewed Urquhart-Bradley's compensation package. *Id.* ¶ 31. Mobley has testified that he felt "comfortable" that Urquhart-Bradley was being paid at an appropriate level. *Id.*

There is a significant factual dispute between parties regarding what was discussed at this private December 13 meeting between Urquhart-Bradley and Mobley. Urquhart-Bradley testified that she planned to discuss "what was going on with V&A," including fallout from the Newmark Siege; their previous negative interactions; concerns about Mobley's intended new company structure; and potential retention benefits. *Id.* ¶ 33. Defendants conversely present the meeting as one where Urquhart-Bradley's primary concern was about her job at C&W and securing "downside" language in her employment contract. *Id.*

The discussion of potential retention benefits forms the crux of this case. Urquhart-Bradley represented to Mobley that two firms were interested in recruiting her and that she would like "some certainties" from C&W before turning them down. *Id.* ¶ 34. Both parties agree that Urquhart-Bradley assured Mobley she was not requesting additional compensation. *Id.* Urquhart-Bradley, however, contends that she did not ask for additional money because Mobley told her the company "could not afford to pay her." *Id.* Urquhart-Bradley alleges that she asked Mobley only for protective contract provisions, given her understanding that the company was financially struggling and in "cost-cutting mode." *Id.* ¶ 33. Urquhart-Bradley testifies that she mentioned Latella and Lewis had received some protective contract provisions in their retention agreements. *Id.* ¶ 196. She and Mobley agreed that she would "send that language to [Mobley]" for review. *Id.* It is undisputed that they did not discuss a term contract or any stock-replacement bonus in the meeting. *Id.* ¶ 38.

One final factual dispute regarding the meeting is worth highlighting. Urquhart-Bradley is emphatic that she did *not* agree to immediately turn down other offers in the meeting. ECF No. 107-1 at 51. But in December, Mobley claimed that in the meeting she had agreed to "call[] the other offer[s] that night and giv[e] them a definitive and final 'no.'" ECF No. 112-2 ¶ 40.

On December 14, Urquhart-Bradley sent Mobley what she now calls a "thank you" email.

*Id.* ¶ 35. Given the emphasis defendants place on this email and Mobley's reaction to it, the Court

will reproduce it in full:

> Shawn,
>
> I want to thank you again for meeting with me yesterday. Understanding your vision and commitment to V&A is paramount in my decision. As I told you, I'm really excited to be part of the "New Way Forward" and am honored to be part of the your [sic] leadership team. I realize the next six months aren't going to be easy and I'm committed to doing my part in righting the ship.
>
> As we discussed the position that I'm going to turn down won't come around again in my career and a term (five years) contract with some assurances would be ideal. While the offer is far more financially lucrative than my current compensation package/existing stock, I understand where we are financially and increasing my compensation and following through on the additional retention (stock) that [former Americas CEO] Tod and I spoke about is not a deal breaker.
>
> We agreed to the following with Eric Lewis and Rick Latella[.]
>
> *[Proposed contract language omitted.]*
>
> In addition, Eric received an $875k retention of which 50% can be purchased in stock and Rick received an $1.1m retention of which 50% can be purchased in stock. Considering that retention and stock aren't part of this agreement, I would assume the assurances would be higher.
>
> As you can imagine, my attorney has strongly urged me to reconsider my decision to remain at C&W on a verbal commitment that when we are in a better financial position, my compensation, including rebalancing the ratio between base and bonus, will be reconsidered. He suggests a letter stipulating our understanding and intent, while not binding, would provide a level of commitment that he could get comfortable with. He also recommended that this document include a creative replacement for the stock that would've

been awarded such as non-discretionary bonus on each contract anniversary. I'll leave the creativity to you.

Please understand that I'm committed to C&W and trust your word but hindsight has proven that something in writing will provide me peace of mind. My attorney would like to review the new contract prior to me declining the other offer, so I will tell them that I need another week to make a decision. Again my intent is to remain at C&W.

Nicole

ECF No. 104-7 at 25–27.

Mobley has testified that he was "shocked" by Urquhart-Bradley's December 14 email, which he viewed as a total "retrade of the agreement" they had made the day before. ECF No. 112-2 ¶ 39. Defendants' statement of material facts does not explain what the "agreement" between him and Urquhart-Bradley entailed, other than that she would decline her other offers. *Id.* ¶ 39–40. Mobley emailed VC Santora, COO Schwartz, and Michelle Hay, then Global Head of Human Resources, forwarding them Urquhart-Bradley's email. ECF No. 104-7 at 25. In an email chain discussing Urquhart-Bradley's email, COO Schwartz called Urquhart-Bradley's email "aggressive" and both VC Santora and Mobley both remarked that it was unclear what Urquhart-Bradley was asking for. ECF No. 104-7 at 23–25.

Mobley called Urquhart-Bradley on December 18 while she was on a work trip to Chicago, uninviting her to the leadership dinner she was set to attend that evening and telling her to return to Washington, D.C. ECF No. 112-2 ¶ 43–44. During this thirteen-minute call, he demanded that she "make a decision." *Id.* Urquhart-Bradley informed Mobley that there was "no decision to make." *Id.* Two days later, Urquhart-Bradley left Mobley a voicemail in which she stated that the "situation was not taken as I intended." *Id.* ¶ 44. She also said she "understood the response" from Mobley and had "turned down" the offer. *Id.* The two spoke later that day during a 27-minute-long

phone call where both parties agree Urquhart-Bradley had "little time to speak." *Id*. ¶ 45. Mobley told Urquhart-Bradley he had "lost confidence in her" and that she needed to either accept the competing offer or look for another job. *Id*. ¶ 48. Urquhart-Bradley stated that she would not resign. *Id*.

The two did not speak again until January 5, at which time Mobley asked if she was leaving and Urquhart-Bradley reiterated she would not resign. *Id*. ¶ 52. While defendants have previously contended that Urquhart-Bradley resigned, they have now changed course and decided to "assume *arguendo*" for this summary judgment motion that she was involuntarily terminated. ECF No. 104-2 at 4. It is thus undisputed that Mobley ultimately terminated Urquhart-Bradley's employment. ECF No. 112-2 ¶ 52.

The day after firing Urquhart-Bradley, Mobley informed his supervisor, Global CEO Brett White, that Urquhart-Bradley was "going to be leaving the firm," citing a "long series of issues, including poor business judgment, her complaints about how hard it is to work at [C&W], inability to manage through change, and [that] she was negotiating to go to a competitor while she was negotiating stay packages during the Newmark raid." ECF No. 104-7 at 28. He also stated that "Michelle [Hay], Santora, and Schwartz have been involved all the way." *Id*.

On January 12, 2018, Urquhart-Bradley received her severance letter, which deemed her termination "not for cause." ECF No. 112-2 ¶ 58. Her employment ended on or around January 18, 2018. *Id*. at ¶ 59. During a leadership call on January 17, other members of the V&A leadership team were informed that there was "mutual" parting of the ways between C&W and Urquhart-Bradley, in contrast with internal records and the undisputed facts on the record. *Id*. ¶ 219. A January 18 email announcing Urquhart-Bradley's departure reported that she had "decided to leave the company." ECF No. 113-6 ¶ 223.

On January 21, three days after her termination, Urquhart-Bradley's counsel of record emailed Cushman's Deputy General Counsel, Stephanie A. Mercer, informing Mercer that she was representing Urquhart-Bradley in "her claims of discrimination against" C&W. ECF No. 112-2 ¶ 61. On June 6, 2018, Urquhart-Bradley filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race, age, and gender discrimination, and retaliation. *Id.* ¶ 62. In its position statement to the EEOC, C&W stated that "Ms. Urquhart-Bradley told Mr. Mobley that she had decided to resign," and they "denied [her] assertion that she 'said that [she] refused to quit,' or that Mr. Mobley 'indicated he would be terminating her employment.'" ECF No. 113-28 at 9. Urquhart-Bradley's charge was dismissed on December 11, 2018, because the EEOC was unable to determine that defendants had violated the law. ECF No. 112-2 ¶ 62. The EEOC specifically noted that it could not determine whether Urquhart-Bradley quit or was fired and that the men Urquhart-Bradley identified were not valid comparators because they were her "subordinates." *Id.*

Urquhart-Bradley was contacted by a recruiting agency on behalf of a role at another company soon after her termination from C&W. *Id.* ¶ 63. One of the recruiters was tasked with collecting references regarding Urquhart-Bradley. *Id.* ¶ 65. The recruiter reached out to a contact with whom she was familiar, Michael Buow, C&W's then-CEO of Asia Pacific and former Global Head of Human Resources. *Id.* On March 13, they spoke on the phone. *Id.* ¶ 66. While both Buow and the recruiter testify they do not remember the specifics of their conversation—and Buow testifies he does not even recall discussing Urquhart-Bradley at all—the recruiter emailed her coworker immediately after the call stating that the call raised a "red flag" with Urquhart-Bradley's candidacy because of "different stories." *Id.* ¶ 67. According to the recruiting agency's internal

documents, her candidacy for the role was then put on hold, though she was interviewed after that date. *Id.* ¶ 73. The position was never filled. *Id.* ¶ 74.

### B. Legal Proceedings

Urquhart-Bradley initiated this proceeding against C&W on September 25, 2018. ECF No. 1. At first, her complaint included only three counts of discrimination against defendant C&W, alleging violations of 42 U.S.C. § 1981 and the DCHRA. *Id.* On January 10, 2019, Urquhart-Bradley amended her complaint to include claims against defendant Shawn Mobley and to add additional claims under Title VII of the Civil Rights Act of 1964 for race and gender discrimination. ECF No. 17.

Mobley moved to dismiss solely for lack of personal jurisdiction. ECF No. 25. This Court initially granted his motion to dismiss in June 2019, ECF No. 33, and Urquhart-Bradley removed her claims against him in her second amended complaint, ECF No. 66. The D.C. Circuit reversed and remanded this decision, ECF No. 81, and the parties ultimately stipulated that this Court has personal jurisdiction over Mobley in September 2020, ECF No. 82.

After learning of Buow's phone call with the recruiter, Urquhart-Bradley moved to file a Second Amended Complaint to include new retaliation claims a year and a half after filing her initial complaint. ECF No. 51. This Court granted that motion. ECF No. 64. Urquhart-Bradley's Second Amended Complaint included a retaliation claim under Title VII, a retaliation claim under the DCHRA, and a retaliation claim under 42 U.S.C. § 1981, all based on Buow's alleged conduct described in detail above. ECF No. 66.

C&W moved to dismiss counts VI, VII, and VIII of Urquhart-Bradley's Second Amended Complaint (the retaliation claims, corresponding to counts XI, XII, and XIII of the Third Amended Complaint). ECF No. 67. C&W argued that Urquhart-Bradley failed to make out a *prima facie*

case of retaliation because she failed to adequately allege that she engaged in a protected activity
and failed to allege facts to establish that Buow took an adverse employment action against her.
*Id.* at 4–5. The Court found that, at the pleading stage, Urquhart-Bradley had sufficiently alleged
both that she "engaged in protected activity" when her attorney informed C&W of her
discrimination claims and that "C&W took adverse action against her." *Urquhart-Bradley v.
Cushman & Wakefield, Inc.,* No. 1:18-CV-2213 (RCL), 2020 WL 4335523, at *2–3 (D.D.C. July
28, 2020). The Court also noted, however, that more would be required from Urquhart-Bradley at
the summary judgment stage. *Id.*

Urquhart-Bradley amended her complaint in on October 2, 2020, one last time to
reincorporate defendant Mobley and the claims against him after the parties stipulated this Court
had personal jurisdiction. ECF No. 86. The Third Amended Complaint includes thirteen claims.
ECF No. 86. Urquhart-Bradley brings five discrimination claims against C&W: one count of race
discrimination under 42 U.S.C. § 1981; one count of race and one count of gender discrimination
under DCHRA; and one count of race and one count of gender discrimination under Title VII.
Urquhart-Bradley brings five discrimination claims against Mobley:[2] one count of race
discrimination under 42 U.S.C. § 1981, and one count each of race discrimination, aiding and
abetting race discrimination, gender discrimination, and aiding and abetting gender discrimination
under the DCHRA. There are three additional retaliation-based counts against C&W under Title
VII, the DCHRA, and 42 U.S.C. § 1981. Counts I–X involve factual allegations regarding

---

[2] Urquhart-Bradley brings five claims against Mobley in his individual capacity. Unlike Title VII, DCHRA
claims and 42 U.S.C. § 1981 claims can be brought against individuals. *See MacIntosh v. Bldg. Owners &
Managers Ass'n Int'l*, 355 F. Supp. 2d 223, 227 (D.D.C. 2005) (holding that "individual supervisors can be
sued under § 1981, even if they could not be sued under Title VII" and that "the law in the District of
Columbia . . . provides for individual liability pursuant to DCHRA").

Urquhart-Bradley's termination. Counts XI–XIII involve factual allegations regarding Buow's phone call to the recruiter and the alleged retaliation.

## II. LEGAL STANDARDS

### A. Summary Judgment

If a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court shall grant summary judgment. Fed. R. Civ. P. 56(a). On a summary judgment motion, all inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 538 (1986). A dispute about a material fact is "genuine" if the nonmovant presents evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Evidence that is "merely colorable" or not sufficiently probative does not create a genuine dispute of material fact. *Id.* at 249–250. The movant is entitled to summary judgment when the nonmovant fails to make a sufficient showing of an essential element of her case for which she bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment must be granted "when, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). The Court's role is not to make credibility determinations or weigh the evidence—only to determine if there is a genuine dispute of material fact. *Id.* at 1113.

### B. Discrimination and Retaliation Claims

Claims of intentional discrimination under Title VII, 42 U.S.C. § 1981, and the DCHRA are all analyzed under the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411

U.S. 792 (1973). *See Wheeler*, 812 F.3d at 1113 (standard for Title VII); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (standard for 42 U.S.C. § 1981); *Craig v. District of Columbia*, 881 F.Supp.2d 26, 34 n.6 (D.D.C 2012) (standard for the DCHRA). Under this framework, the plaintiff bears the initial burden to show a *prima facie* case of discrimination.[3] *Id.* If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its action." *Id*. If the employer articulates such a reason, the burden shifts back to the plaintiff, who must show through direct or indirect proof that the proffered reason is a pretext for unlawful discrimination. *Id.*

A plaintiff in an unlawful discrimination case can support an inference that the employer's alleged reason is pretextual and that unlawful discrimination is the true reason for an adverse employment action by citing evidence such as "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). Usually, "proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'" *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (quoting *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)). But that is not always the case. "If the plaintiff explodes the phony reason with evidence that simply supports an unsavory but lawful alternative reason," summary judgment for the defendant is appropriate. *Carpenter*, 165 F.3d at 72.

---

[3] "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

In practice, when reviewing a motion for summary judgment where a defendant has offered a legitimate, nondiscriminatory reason for its action, the question of the *prima facie* case becomes irrelevant and "drops out of the picture." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Courts instead skip ahead to the third step in the *McDonnell Douglas* test. *Wheeler*, 812 F.3d at 1114. At the third step, one ultimate question remains:

> Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady*, 520 F.3d at 494.

Retaliation claims also follow the *McDonnell Douglas* framework. *Jones v. Bernanke*, 557 F.3d 670, 673 (D.C. Cir. 2009). To establish a *prima facie* case for retaliation, the plaintiff must show that she (1) engaged in statutorily protected activity, (2) suffered a materially adverse action by her employer, and (3) that there was a causal connection between the two. *Id*. Like a discrimination claim, if the employer proffers a legitimate, nondiscriminatory reason for the adverse action, the burden-shifting framework of *McDonnell Douglas* disappears and a court on summary judgment considers whether a reasonable jury could infer retaliation from all of the evidence. *Id*. A negative employment reference by an employer may serve as a materially adverse action by her employer if the plaintiff demonstrates "(1) that disparaging comments were made; (2) the person to whom the comments were made; and (3) that the plaintiff was denied employment because of the negative job reference." *Simmons v. Cox*, 495 F. Supp. 2d 57, 66 (D.D.C. 2007), *aff'd*, No. 07-5268, 2008 WL 2516463 (D.C. Cir. Feb. 25, 2008).

### III. DISCUSSION

Urquhart-Bradley brings seven discrimination claims and three retaliation claims against C&W. She brings five discrimination claims against Mobley. For the reasons explained below, her

discrimination claims against both C&W and Mobley raise a genuine dispute of material fact that must be resolved by a jury. On the other hand, her three retaliation claims fail to raise a genuine dispute of material fact.

### A. Discrimination Claims Against Defendants C&W and Mobley

After nearly fifteen years at C&W, Urquhart-Bradley was terminated on or around January 18, 2018. ECF No. 112-2, ¶¶ 1, 59. Defendants now contend that she was fired because Mobley, then CEO, was "shocked and upset" by what he perceived to be an "about-face" after a meeting he had with Urquhart-Bradley. ECF No. 104-2 at 5. They maintain that this shock at the "retread of an agreement," combined with the "deeply troubling" fact that Urquhart-Bradley was simultaneously attempting to negotiate her own retention while also negotiating retention for her subordinates, resulted in a "loss of trust" that ultimately led to her termination. *Id*. at 6. Given the highly subjective nature of these reasons, the Court must "treat such explanations with caution on summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012).

The relevant inquiry on a motion for summary judgment is whether the defendants' asserted reason for firing Urquhart-Bradley was the actual reason, or if it was a pretext for firing her because of her race, gender, or both. When evaluating this question, the Court asks whether the jury could infer discrimination from the combination of all the evidence plaintiff puts forth. *Wheeler*, 812 F.3d at 1115. Pointing to inconsistent explanations for her departure, the disparate treatment of her alleged comparator, and evidence of other conduct and statements by COO Schwartz and Mobley, Urquhart-Bradley has produced sufficient evidence for a reasonable juror to find that defendants' proffered reasons were a pretext for discrimination.

i.    *Urquhart-Bradley Provides Evidence That C&W's Proffered Reasons For Her*
      *Termination Are Inconsistent*

An employee can support an inference of an invidious motive if there were "changes and inconsistencies" in the employer's given reason for the decision. *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015). Urquhart-Bradley contends that Mobley and C&W have repeatedly offered inconsistent explanations for why she left C&W. For example, though it is undisputed that Urquhart-Bradley was involuntarily terminated, ECF No. 104-2 at 4, defendants represented to the EEOC that her employment ended via resignation, ECF No. 112-2 ¶ 62, and to the public that Urquhart-Bradley had "decided to leave the company," ECF No. 113–6 ¶ 223. While Mobley informed his supervisor in January 2018 that Urquhart-Bradley was leaving due to "a long series of issues" including "poor business judgment," "inability to manage through change," and "negotiating to go to a competitor," defendants now explain that this "long series of issues" covered only the three weeks from December 14, 2017 to January 6, 2018, ECF No. 104-2 at 19, and the record indicates that Urquhart-Bradley's performance during the Newmark Siege was praised, ECF No. 112-2 ¶ 143-48.

Defendants shrug off these inconsistent explanations as mere semantic differences or, at worst, "minor" inconsistencies. ECF No. 104–2 at 18. But this Court fails to see how representing to the EEOC during a discrimination investigation that Urquhart-Bradley resigned when she was in fact terminated is "mere semantics." C&W told the EEOC that "Ms. Urquhart-Bradley had decided to resign." ECF No. 113-28 at 9. They "denie[d] Ms. Urquhart-Bradley's assertion that she 'said that [she] refused to quit,' or that Mr. Mobley 'indicated that he would be terminating her employment.'" *Id.* Now, defendants explicitly admit as an undisputed fact that Urquhart-Bradley *did* state "she would not resign," ECF No. 104-3 ¶¶ 48, 52, and that she was terminated, ECF No. 104-2 at 4. "In this [C]ircuit, we have repeatedly treated false statements by a defendant

as credible evidence of consciousness of guilt." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998). These "inconsistent or dishonest explanations" could lead a reasonable jury to determine that the reasons put forth are pretextual reasons to cover up discrimination. *Walker*, 798 F.3d at 1092.

ii.    *John Busi Is A Valid Comparator*

Urquhart-Bradley next alleges that comparators were treated differently when requesting similar retention packages or negotiating with competitors. ECF No. 112 at 34. Urquhart-Bradley identifies four executives as potential comparators: her direct predecessor, John Busi; her subordinate turned direct successor, Eric Lewis; V&A retail group leader Rick Latella; and Mobley himself. ECF No. 113-5 at 35–36. When predecessor Busi threatened to leave for a competitor, C&W offered him nearly $3 million in potential retention benefits. ECF No. 113–6 ¶ 157. Both Lewis and Latella received sizable retention packages after entertaining offers during the Newmark Siege. ECF No. 104–2 at 13. Mobley successfully secured a $750,000 retention package after meeting with a competitor on or around September 2016. ECF No. 113–6 ¶ 162–63.

To support an allegation of pretext through comparator evidence, a plaintiff must demonstrate that she and the comparators were similarly situated. *Wheeler*, 812 F.3d at 1115. Similarly situated employees must be "charged with offenses of comparable seriousness" if discipline is involved,[4] and "all of the relevant aspects" of the plaintiff's employment situation must be "nearly identical to those of the other employee[s]." *Id.* at 1115–116 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)). Whether two or more employees are "similarly-situated" is typically a question of fact for the jury, but some employees cannot be similarly situated as a matter of law. *George*, 407 F.3d at 414.

---

[4] Since defendants contend that Urquhart-Bradley's actions surrounding her request for retention were the reason for her termination, the Court will use the term "offense" to describe such actions.

To start, Lewis and Latella cannot serve as comparators as a matter of law because they were Urquhart-Bradley's subordinates when they committed the alleged comparable "offenses" (considering offers from competitors and attempting to secure retention packages) and thus, "by definition, [] do not deal with the same supervisor and are not subject to the same standards as plaintiff." *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001). In fact, as defendants have pointed out, Urquhart-Bradley was directly *involved* in helping to secure their retention packages. ECF No. 104-2 at 13 n.2. Similarly, defendant Mobley cannot serve as a comparator as a matter of law. Though, like Urquhart-Bradley, he was a member of the Americas leadership team at the time he allegedly received an offer that he leveraged for retention, ECF No. 112 at 36, he held a different title, performed entirely different duties, and reported to a different supervisor, ECF No. 112 at 36, 38.

But a jury could find that John Busi was "similarly-situated" to Urquhart-Bradley. Busi, Urquhart-Bradley's direct predecessor and a white man, held the exact same role (and title) that she did—President of V&A, Americas—before he left for Newmark in August 2016. ECF No. 112 at 35 n.25; ECF No. 104-3 at 3. His "offense," bargaining with (and ultimately leaving for) a competitor, is comparable to Urquhart-Bradley's alleged "offense." And unlike Urquhart-Bradley, when Busi approached C&W with his alleged offer from another employer, they counteroffered with a robust retention package. ECF No. 113-6 at 67. Even after Busi accepted Newmark's offer, members of the C&W leadership team, including one directly involved in the decision to terminate Urquhart-Bradley, expressed regret that Busi did not let them counteroffer again. ECF No. 113-13 at 5.

Defendants' argument that John Busi was not "similarly situated" solely because he reported to a different supervisor is inapposite. ECF No. 104-2 at 14–15. As this Circuit has

explained, the "same supervisor" criterion has never been read as an "inflexible requirement." *Wheeler*, 812 F.3d at 1118 (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563–64 (6th Cir. 2013)). The question is whether, viewing the evidence in the light most favorable to Urquhart-Bradley, the comparators were subject to the same decisionmakers to a "sufficient extent to allow a meaningful comparison as to how these [employees] were ultimately treated by the [company]." *Id.* Busi left C&W only the year before Urquhart-Bradley's discussion with Mobley led to her termination. ECF No. 104-3 at 3. Undisputed evidence shows that they had at least one relevant decisionmaker in common: VC Santora, who worked to retain Busi when he left for Newmark, ECF No. 113-13 at 5, and who consulted with Mobley in regard to Urquhart-Bradley's request and ultimate termination, ECF No. 112-2 ¶ 213; ECF No. 104-7 at 25–32.

Defendants stress this Court's decision in *Vinh v. Washington Metropolitan Area Transit Authority*, 299 F. Supp. 3d 75 (D.D.C. 2018), to support their argument that Busi cannot serve as a comparator because Mobley was not directly involved in Busi's retention offer. ECF No. 104-2 at 13. In *Vinh*, the plaintiff was terminated from his job after being convicted of assault, then rehired after he successfully appealed his conviction. *Vinh*, 299 F.Supp. 3d at 77. He challenged the fact that he was rehired (as opposed to reinstated) and identified an alleged comparator who had been reinstated. *Id.* at 82. The Court held that Vinh and his alleged comparators were not similarly situated, in part because the reinstatement and rehiring decisions were made by different supervisors. *Id.* But the plaintiff in *Vinh* had *additional* significant differences from his alleged comparator: his alleged comparator had been reinstated nearly six years before the plaintiff and his alleged comparator's reinstatement potentially *violated* the relevant collective bargaining agreement. *Id.* No similar circumstances are implicated here.

*iii.*     *Urquhart-Bradley Provides Additional Evidence Of Discrimination To Support Her Claim Of Pretext*

In an employment discrimination case, plaintiff is not limited to merely showing that the employer's explanation is a lie; she can also attempt to show "by other means that the explanation was made up to disguise illegitimate bias." *Aka*, 156 F.3d 1284. To do so, Urquhart-Bradley puts forth evidence that she contends is indicative of Mobley and COO Schwartz's illicit motives. Urquhart-Bradley cites evidence of Mobley's habit of interrupting women during meetings, including "repeatedly derailing [her] presentations," ECF No. 112 at 45, as evidence of his bias towards women. She contends that other "women in leadership at C&W have complained specifically about their interactions with Defendant Mobley," and his interrupting other women. ECF No. 112-2 ¶ 104.

Urquhart-Bradley also provides evidence of her experiences with COO Schwartz, who consulted with Mobley on her termination, ECF No. 112-2 ¶ 213, to prove an illicit motive. She describes an interaction with COO Schwartz only a week before her meeting with Mobley where Schwartz "made a denigrating comment about C&W's Global Chief Information Officer . . . by remarking how he wished [the CIO] 'would stop using the black gay thing.'"[5] ECF No. 112 at 17. After she, in her words, "failed to affirm" his statement, Schwartz emailed Mobley and Hay the same day, stating that they "need to figure out if [Urquhart-Bradley] can become a part of the team rather than an 'outsider' with an axe to grind against executive management." ECF No. 112-2

---

[5] COO Schwartz denies making this statement. On a motion for summary judgment, all factual disputes are resolved in favor of the plaintiff.

¶ 189. Urquhart-Bradley characterizes Schwartz's language as invoking "pernicious stereotype[s] levied against . . . Black women in particular." ECF No. 112 at 19.

Defendants argue that COO Schwartz's alleged comments are "nothing more than stray remarks" with no relevance to Mobley's decisionmaking regarding Urquhart-Bradley's termination. ECF No. 104-2 at 11. It is well established that "stray remarks in the workplace, particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself" cannot constitute direct evidence of discrimination. *Brady v. Livingood*, 456 F. Supp. 2d 1, 7 (D.D.C. 2006). But these statements can be evaluated as "other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092. Defendants do not dispute that COO Schwartz was involved in the decisionmaking process. ECF No. 112-2 ¶ 213. These comments can therefore be evaluated in combination with all other evidence that Urquhart-Bradley presents of C&W and Mobley's illicit motives.

Viewing "all of the evidence" in combination, as the Court is required to do, *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003), Urquhart-Bradley has demonstrated that there is a genuine dispute of material fact regarding why she was terminated from C&W and that the defendants are not entitled to summary judgment. Accordingly, the Court will **DENY** defendants' motion for summary judgment on the five discrimination claims against C&W and the five discrimination claims against Mobley.

### B. Urquhart-Bradley's Retaliation Claims

Next, this Court evaluates Urquhart-Bradley's three retaliation claims. These claims relate to a phone call C&W's then-CEO of Asia Pacific and former Global Head of Human Resources Matthew Buow had with a recruiter asking for a reference on Urquhart-Bradley. ECF No. 113-6 ¶ 63-74. Urquhart-Bradley has failed to raise a genuine dispute of material fact regarding her

retaliation claims because she has not made a sufficient showing as to the material elements of her *prima facie* case for discrimination. *Celotex Corp.*, 477 U.S. at 323.[6] Urquhart-Bradley has failed to put forth sufficient evidence for a reasonable jury to conclude that she engaged in protected activity or that Buow knew of her alleged protected activity, both essential elements of her claims.

    *i.*    *There Is No Genuine Dispute of Material Fact As To Whether Urquhart-Bradley Engaged In Protected Activities In January 2018*

Title VII's relevant antiretaliation provision prohibits discrimination against an employee because the employee either opposed any practice made unlawful by Title VII or "made a charge, testified, or participated in" a Title VII investigation or proceeding. *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) (quotation marks omitted). Urquhart-Bradley had not filed a Title VII complaint by the time of the alleged retaliation, so the relevant provision only applies if she properly "opposed any practice" made unlawful by Title VII.

The totality of Urquhart-Bradley's alleged protected activity consists of an email sent from her lawyer to C&W's Deputy General Counsel:

> I represent Nichole Urquhart-Bradley in her claims of discrimination against Cushman & Wakefield and Shawn Mobley. Please direct all further communication concerning the matter to me.

ECF No. 56-2 at 3. Defendants argue that this email cannot constitute protected activity, because it is a threat of legal action "divorced from any allegation of unlawful discrimination on a statutorily protected ground." ECF No. 104-2 at 23 (quoting *Robbins v District of Columbia*, 650 F. App'x 37, 40 (D.C. Cir. 2016) (per curiam)). Urquhart-Bradley accuses defendants of playing a game of "magic words," and notes that all that is required is that unlawful discrimination is

---

[6] "The elements of a prima facie case for a DCHRA retaliation claim are the same as those under Title VII." *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 315 (D.D.C. 2015). A retaliation claim under section 1981 is also comprised of the same elements. *Carney v. Am. Univ.*, 151 F.3d 1090, 1094–95 (D.C. Cir. 1998)

alleged "in some way." ECF No. 112 at 9–10 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)).

Not every accusation "garners its author protection." *Broderick*, 437 F.3d at 1232. The accusation must allege unlawful discrimination "in some way," *id.*, and "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activities." *Clemmons*, 107 F. Supp. 3d at 128. The email here does not mention discrimination based on Urquhart-Bradley's protected classes and it is plain that if *she* had sent the email herself, it would not constitute protected activity. *Cf. Gibbs v. Washington Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 133 (D.D.C. 2014) ("[B]are use of the word 'discrimination' . . . without any discussion of a protected basis is insufficient to create protected activity.").

Urquhart-Bradley emphasizes that the email came not from herself, but from her lawyer. She argues that another court in this District has held that a plaintiff informing a supervisor that a performance review was "discriminatory" and that they "intended to hire an attorney" constituted protected activity. *Powell v. Lockhart*, 629 F. Supp. 2d 23, 39 (D.D.C. 2009). But this Court will not depart from consistent decisions in this District based on one potentially anomalous and factually distinct opinion. *Robbins* makes it clear that an "allegation of unlawful discrimination on a statutorily protected ground" is required. *Robbins*, 650 F. App'x at 40. Plaintiffs must "complai[n] of some unlawful discrimination based on [their] membership in a protected class" for an activity to be protected. *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011), *aff'd*, 573 F. App'x 1 (D.C. Cir. 2014). Because Urquhart-Bradley's lawyer alleged discrimination "generally and generically" and did not refer to specific discrimination based "on race or any other protected category," she has not sufficiently demonstrated she engaged in protected activity. *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 92 (D.D.C. 2006).

Accordingly, she has failed to create a genuine dispute of material fact that she engaged in protected activity as required in a *prima facie* case of retaliation.

    ii.    *There Is No Genuine Dispute Of Material Fact As To Whether Matthew Buow Was Aware Of Urquhart-Bradley's Protected Activities*

Even if Urquhart-Bradley has established she was engaged in a protected activity, she has also failed to present the necessary evidence from which a reasonable jury could find that the alleged negative reference was "the result of unlawful retaliation." *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). A plaintiff may satisfy the causation element of a *prima facie* case of retaliation by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006). It is undisputed that to prove that there was unlawful retaliation, she must first show that Buow, who allegedly retaliated against her, knew about her purported protected activity. *Id.* Buow "could not have retaliated against her" if he did not know about her activity to begin with. *Jones*, 557 F.3d at 679.

Urquhart-Bradley's argument that Buow knew of her alleged protected activity goes like this: based on her personal experience at C&W for over fifteen years, "however something came up from a legal perspective the powers that be knew it." ECF No. 112-2 ¶ 71. The temporal proximity alone between her emailing C&W and Buow's alleged retaliation two months later, she argues, is sufficient at the *prima facie* stage. She also cites as evidence the fact that Tod Lickerman testified that "before Board meetings a summary of outstanding complaints was prepared" and that global leadership "did play a role in handling complaints." *Id.* ¶ 69. Because Buow attended a C&W Board meeting in Los Angeles roughly a week before he allegedly retaliated against her, ECF No. 112-2 ¶ 242, Urquhart-Bradley asserts that he *could* have learned of the complaint there.

Urquhart-Bradley is correct that she does not need to provide direct evidence that Buow had knowledge of her alleged protected activity. ECF No. 112 at 13. Instead, she need only "offer circumstantial evidence that could reasonably support an inference" that he knew. *Jones*, 557 F.3d at 679. Still, evidence that requires a jury to "speculate" that her employer knew of her protected activity is insufficient to survive summary judgment. *Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016).

Evidence that the employer in general was aware of the protected activity is often sufficient to prove a specific supervisor had knowledge, at least at the "prima facie stage." *Hamilton*, 666 F.3d at 1358. But when confronted with "unequivocal sworn statements denying knowledge, as here, mere speculation fails to create a genuine issue of material fact to avoid summary judgment." *Test v. Holder,* 614 F. Supp. 2d 73, 82 (D.D.C. 2009) (cleaned up). Buow swore on the record that he was not aware of Urquhart-Bradley's email when he allegedly retaliated against her. ECF No. 104-3 ¶ 68. Besides proffering certain scenarios in which Buow *could* have learned about the email from others, Urquhart-Bradley provides absolutely no evidence to dispute this fact. And these scenarios are no more than speculation on top of speculation: that Lickerman and the other board members reviewed the summary of outstanding complaints and then chose to share them, for example, and that Urquhart-Bradley's complaint was even included on that alleged list. "The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) (quoting *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008)).

Because Urquhart-Bradley has failed to "make a showing sufficient to establish the existence of an element essential to [her] case" on which she bears the burden of proof at trial,

*Celotex*, 477 U.S. at 322, the Court will grant defendants' motion for summary judgment on the three retaliation claims.

### IV. CONCLUSION

For the reasons put forth above, the Court will **DENY** defendants' motion for summary judgment on Counts I-X and will **GRANT** defendants' motion for summary judgment on Counts XI-XIII by separate Order.

Date: September 28, 2021

Hon. Royce C. Lamberth
United States District Judge